**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**SAYLOR, C.J., EAKIN, BAER, TODD, DONOHUE, DOUGHERTY, WECHT, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 19 EAP 2015 |
| | : | |
| Appellant | : | Appeal from the Judgment of Superior |
| | : | Court entered 11/10/2014 at No. 272 |
| | : | EDA 2013 reversing the Judgment of |
| v. | : | Sentence entered on 1/16/2013 in the |
| | : | Court of Common Pleas, Philadelphia |
| | : | County, Criminal Division at No. CP-51- |
| WILLIAM CHILDS, | : | CR-0012722-2010. |
| | : | |
| Appellee | : | ARGUED:  March 9, 2016 |

**OPINION**

JUSTICE DONOHUE                                                    DECIDED:  July 19, 2016

In this appeal by the Commonwealth, we are asked to determine whether William Childs ("Childs") was entitled to a castle doctrine[1] jury instruction pursuant to 18 Pa.C.S.A. § 505(b)(2.1), which became effective after Childs was charged with the crimes at issue but prior to his trial on those charges.  We conclude that section 505(b)(2.1) does not affect a person's right to use deadly force within his or her home, but rather creates an evidentiary presumption relevant to the evaluation of such a claim of self-defense, and is therefore a procedural statute.  Because section 505(b)(2.1)

---

[1] As discussed at further length herein, the castle doctrine is a specialized component of self-defense, which recognizes that a person has no duty to retreat from his or her home before using deadly force as a means of self-defense. *See* Commonwealth v. Johnston, 263 A.2d 376 (Pa. 1970); Denise M. Drake, The Castle Doctrine: An Expanding Right to Stand Your Ground, 39 St. Mary's L.J. 573, 584 (2008).

became effective prior to Childs' trials, he was entitled to jury instructions in conformance therewith. We therefore affirm the Superior Court's decision vacating Childs' judgment of sentence and remanding for a new trial.

In July 2010, Childs was residing with Michael Beander ("Beander") and Samuel Andrews ("Andrews") in Andrews' house. On July 29, 2010, Andrews invited Bryant Bell ("Victim") to come over to celebrate Victim's birthday. All four men were socializing in the residence when Childs and Victim began to argue. During the argument, Victim called Childs, who has a spinal cord injury and uses a cane, a cripple. Upset by the encounter, Andrews told Victim to leave. Beander and Victim exited the residence and sat on the front steps, while Andrews retreated to his bedroom. Childs remained in the house.

Almost immediately, Childs and Victim restarted their argument, trading insults and threats through the screen door. After a few minutes of this back-and-forth, Victim ascended the stairs, picked up a broomstick that had been sitting on the porch, and approached the door. Victim overcame Childs' efforts to hold the screen door closed and entered the residence. Victim struck Childs with the broomstick several times before Childs stabbed Victim in the chest. Although Childs stabbed Victim only once, Victim died from this wound. Childs was arrested and charged with homicide and possessing instruments of crime ("PIC").[2]

---

[2] 18 Pa.C.S.A. §§ 2501, 907.

On June 28, 2011, the legislature passed Act 2011-10, H.B. No. 40 ("Act 10"),[3] amending Titles 18 (Crimes and Offenses) and 42 (Judicial Procedure) of the Pennsylvania Consolidated Statutes. Of relevance to the present case, Act 10 included amendments to 18 Pa.C.S.A. § 505, Limitations on Justifying Necessity for Use of Force. These amendments included section 505(b)(2.1), which provides:

> Except as otherwise provided in paragraph (2.2), an actor is presumed to have a reasonable belief that deadly force is immediately necessary to protect himself against death, serious bodily injury, kidnapping or sexual intercourse compelled by force or threat if both of the following conditions exist:
>
> (i) The person against whom the force is used is in the process of unlawfully and forcefully entering, or has unlawfully and forcefully entered and is present within, a dwelling, residence or occupied vehicle; or the person against whom the force is used is or is attempting to unlawfully and forcefully remove another against that other's will from the dwelling, residence or occupied vehicle.
>
> (ii) The actor knows or has reason to believe that the unlawful and forceful entry or act is occurring or has occurred.

18 Pa.C.S.A. § 505(b)(2.1).

In November 2011, Childs was tried on the murder and PIC charges stemming from Victim's death. This trial resulted in a conviction on the PIC charge, but the jury deadlocked on the homicide charge. In November 2012, Childs was tried again on the homicide charge. At both trials, Childs claimed that he acted in self-defense and requested a castle doctrine jury instruction in conformance with section 505(b)(2.1),

---

[3] The Commonwealth refers to this legislation as Act 48, *see* Brief for the Commonwealth at 10, but as it was enacted as Act No. 10 of 2011, we refer to it as Act 10.

providing that there is a presumption that he had a reasonable belief that deadly force was immediately necessary to protect himself from serious bodily injury or death because he was attacked inside his residence.[4]  N.T., 11/10/2011, at 4-5; N.T., 11/16/2012, at 28-29.  In response, the Commonwealth did not dispute that the facts of the case entitled Childs to a castle doctrine defense, but objected to Childs' request on the basis that section 505(b)(2.1) did not become effective until more than a year after Childs stabbed Victim, and that giving the instruction would be an improper retroactive application of a substantive law.  N.T., 11/10/2011, at 6-7; N.T., 11/16/2012, at 29.[5]  The trial court refused Childs' request at both trials.  On November 16, 2012, Childs was convicted of third-degree murder.  He was subsequently sentenced to a term of sixteen to thirty-two years of imprisonment for the murder conviction and a consecutive term of five years of probation on the PIC conviction.

Childs appealed.  The sole question before the Superior Court was whether the trial court correctly concluded that section 505(b)(2.1) should not be applied retroactively.  The Superior Court noted that "the law of retroactivity is less than a model of clarity" before undertaking a thorough discussion tracing the history of the prohibition

---

[4]  Childs requested the instruction in substantial conformance with the instruction contained in the Pennsylvania Suggested Standard Criminal Jury Instructions that was issued following the enactment of section 505(b)(2.1).  *See* Pa.SSJI (Crim) § 9.501A (2012) (Use of Force/Deadly Force in Self-Defense).

[5]  When Childs' counsel requested the section 505(b)(2.1) instruction at his first trial, the trial court voiced its concern that the facts did not support such a charge.  N.T., 11/10/2011, at 8-9.  The Commonwealth did not adopt this position or object to Childs' request on the basis that the facts of the case did not support a castle doctrine defense.  At Childs' second trial, neither the trial court nor the Commonwealth questioned whether the facts of this case supported a castle doctrine instruction.  In fact, at both trials, the trial court gave an instruction pertaining to self-defense while in a residence.  Id. at 125; N.T., 11/16/2012, at 119.

against the retroactive application of legislation and the exceptions thereto.[6] The Superior Court began by recognizing that "a statute is impermissibly retroactive if it 'attaches new legal consequences to events completed before its enactment. Retroactive application occurs only when the statute or rule relates back and gives a previous transaction a legal effect different from that which it had under the law in effect when it transpired.'" Commonwealth v. Childs, 272 EDA 2014, *7-8 (Pa. Super. Nov. 10, 2014) (quoting Commonwealth v. Robinson, 7 A.3d 868, 871-72 (Pa. Super. 2010)). The Superior Court further recognized that concerns of impermissible retroactive application arise only where the law at issue impairs a vested right or contractual obligation. Id. at *8 (citing Commonwealth v. Johnson, 553 A.2d 897 (Pa. 1989)).

The Superior Court discussed the well-established principle that legislation that is procedural, as opposed to substantive, is not subject to the prohibition against the retroactive application of laws. While observing that "substantive laws are those which affect rights, while procedural laws are those which address methods by which rights are enforced," it also recognized that "[t]he demarcation between substantive and procedural law is, … at times[,] shadowy and difficult to determine." Id. at *10-11 (quoting Morabito's Auto Sales v. Commonwealth, Dep't of Transp. 715 A.2d 384, 386 (Pa. 1998)).

With regard to the case at bar, the Superior Court concluded that section 505(b)(2.1) did not alter a defendant's rights concerning claims of self-defense premised

---

[6] One such exception that the Superior Court discussed is the doctrine of abatement, which, since "the early days of this Commonwealth," has provided that "the prohibition against retroactive criminal laws d[oes] not apply to statutes affecting the substantive rights of an accused where the law benefited the accused." Commonwealth v. Childs, 272 EDA 2014, *6 (Pa. Super. Nov. 10, 2014).

on actions in the home.  Id. at *25-26.  It reasoned that section 505(b)(2.1) only "addresses a method of enforcing th[e] right of self-defense" and is therefore procedural.  Id. at *27.  Because there is no prohibition on the retroactive application of a procedural statute, the Superior Court reasoned, Childs was entitled to a jury instruction regarding the castle doctrine.  On that basis, it vacated Childs' judgment of sentence and remanded for a new trial.

In dissent, the Honorable Judge Eugene Strassburger reasoned that section 505(b)(2.1) is a substantive statute because, in his view, it "directly affect[s] the right of self-defense" because it governs when an actor may defend himself with deadly force.  Id., at *1 (Strassburger, J., dissenting).  Because the legislature did not expressly indicate its intent that section 505(b)(2.1) apply retroactively, Judge Strassburger concluded that the trial court did not err in refusing Childs' requested jury instruction.  Id. at *1-2.

We granted allowance of appeal to consider whether the Superior Court erred in its interpretation of section 505(b)(2.1).  "Statutory interpretation is a matter of law, and our standard of review is de novo and our scope of review is plenary."  Commonwealth v. Spence, 91 A.3d 44, 46 (Pa. 2014).

The Commonwealth advances three main arguments in support of its position.  First, it argues that because the language of section 505(b)(2.1) does not explicitly provide that it should be applied to cases pending on the date of its enactment, it cannot be applied to Childs' case. In this regard, it contends that Commonwealth v. Shaffer,

734 A.2d 840 (Pa. 1999), is "highly instructive" on this point.[7] Commonwealth's Brief at 11-12. The Commonwealth posits that if the legislature had wanted this provision to be applied to pending cases, it would have included language expressly providing for such application, but because it did not, we are bound to consider this omission as proof of its intent that the law not apply retroactively.

Second, the Commonwealth challenges the Superior Court's determination that because section 505(b)(2.1) creates an evidentiary presumption, it is a procedural statute. According to the Commonwealth, section 505(b)(2.1) was enacted as part of a "comprehensive effort to revamp the law of self-defense" and therefore must be read as affecting the substantive rights of accused persons. Id. at 14-15. The Commonwealth further contends that Morabito's Auto Sales v. Commonwealth, 715 A.2d 384 (Pa. 1998), held that an evidentiary presumption created by a new statute applies

---

[7] The defendant in Shaffer was convicted of multiple crimes, including corrupt organizations, 18 Pa.C.S.A. § 911. While his appeal was pending before the Superior Court, this Court ruled, in Commonwealth v. Besch, 674 A.2d 655 (Pa. 1996), that the definition of enterprise in the corrupt organizations statute did not include wholly illegitimate enterprises. The defendant in Shaffer argued that based upon our decision in Besch, his convictions must be vacated. Also during the pendency of the defendant's appeal, however, the legislature amended the definition of enterprise to include wholly illegitimate enterprises. The Superior Court concluded that the amended statute effectively overruled Besch, and further that the amended definition of enterprise applied to the defendant's convictions. Shaffer, 734 A.2d at 841. We reversed the Superior Court on the basis that our interpretation of enterprise in Besch became part of the legislation from the date of its enactment, and that the legislature could only amend this interpretation prospectively. Id. at 843-44. In the course of reaching this conclusion, we noted that both a principle of statutory construction and prior precedent from this Court provide that amendatory statutes are construed retroactively only if the legislature has expressed its intention for such application. Id. at 843 (citing 1 Pa.C.S.A. § 1953; Commonwealth v. Scoleri, 160 A.2d 215, 227 (Pa. 1960)). The Commonwealth appears to rely on Shaffer for this principle.

prospectively only, without regard to whether the presumption may be properly classified as procedural or substantive.

Finally, the Commonwealth disputes the Superior Court's determination that the doctrine of abatement permits the retroactive application of substantive statutes when they benefit criminal defendants. Commonwealth's Brief at 18-19. Citing Commonwealth v. Scoleri, 160 A.2d 215 (Pa. 1960), the Commonwealth argues that "this Court held that a statute that benefitted defendants by preventing prejudicial evidence from being introduced at the guilt phase of trial court **not** be applied to pending cases because doing so would run afoul of the Statutory Construction Act." Brief of the Commonwealth at 19 (emphasis in original).

In contrast, Childs argues that that the Superior Court was correct in its determination that section 505(b)(2.1) is procedural. Childs argues that this determination was accurate because section 505(b)(2.1) impacts how a jury reaches its decision, as opposed to what the jury must ultimately decide. Childs' Brief at 18. Although the legislature did not explicitly provide that section 505(b)(2.1) applies retroactively, there is a necessary implication that it intended retroactive application. This implication, Childs argues, arises because the legislature drafted section 505(b)(2.1) to have no effect outside of trial, and from language contained in the preamble to Act 10, which states that the purpose of Act 10 was to codify the common law and constitutional rights of citizens to protect themselves in their homes. Lastly, Childs contends that even if we were to determine that section 505(b)(2.1) is substantive, it would still be applicable to him (as well as to other cases pending at the time of its enactment) pursuant to the doctrine of abatement. Id. at 27-29.

"The traditional common[]law castle doctrine is a basic tenet of American law: 'The principle that a man's home is his castle is basic to our system of jurisprudence.'" Wyatt Holliday, "The Answer to Criminal Aggression Is Retaliation" : Stand-Your-Ground Laws and the Liberalization of Self-Defense, 43 U. Tol. L. Rev. 407, 408 (2012) (quoting Lombard v. Louisiana, 373 U.S. 267, 275 (1963) (Douglas, J., concurring)). The ideological foundation for the castle doctrine is the belief that a person's home is his castle and that one should not be required to retreat from his sanctum. Denise M. Drake, The Castle Doctrine: An Expanding Right to Stand Your Ground, 39 St. Mary's L.J. 573, 584 (2008). The castle doctrine is often described as being of ancient origins. Joshua G. Light, The Castle Doctrine - The Lobby Is My Dwelling, 22 Widener L.J. 219, 221 (2012); see also H.B. 40 159th Gen. Assemb., Reg. Sess. (Pa. 2011)). Indeed, a reference to this concept is found in the Bible: "If the thief is caught while breaking in and is struck so that he dies, there will be no bloodguiltiness on his account." Exodus 22:2 (New American Standard Bible). When this Court addressed the castle doctrine in 1952, we explained that it "has always been recognized as the law in this State" and that the castle doctrine's acceptance is "universal." Commonwealth v. Fraser, 85 A.2d 126,128 (Pa. 1952).

Although the castle doctrine has existed at common law in this Commonwealth essentially since its founding, it was not codified in Pennsylvania until 1972, with the enactment of 18 Pa.C.S.A. § 505. In enacting section 505, the legislature sought "to codify existing case law pertaining to 'self-defense' and to cover in a single rule the law governing the use of defensive force." 18 Pa.C.S.A. § 505 (amended June 28, 2011), Official Comment 1972. The legislature emphasized that section 505 made no

substantial change to the existing law. Id. Section 505 set forth the circumstances under which the use of force for purposes of self-defense was justified, and addressed the use of deadly force specifically in subsection (b)(2). Within this provision, the castle doctrine was codified as follows:

**(b) Limitations of justifying necessity for use of force**:

\*\*\*

(2) The use of deadly force is not justifiable under this section unless the actor believes that such force is necessary to protect himself against death, serious bodily injury, kidnapping or sexual intercourse compelled by force or threat; nor is it justifiable if:

\*\*\*

(ii) the actor knows that he can avoid the necessity of using such force with complete safety by retreating or by surrendering possession of a thing to a person asserting a claim of right thereto or by complying with a demand that he abstain from any action which he has no duty to take, except that:

(A) the actor is not obliged to retreat from his dwelling or place of work, unless he was the initial aggressor or is assailed in his place of work by another person whose place of work the actor knows it to be[.]

18 Pa.C.S.A. § 505(b)(2)(ii)(A) (amended June 28, 2011). The official comment to this provision reiterated the precept of the castle doctrine, restating that "[a] person is not required to retreat if he is attacked in his own home." 18 Pa.C.S.A. § 505 (amended June 28, 2011), Official Comment 1972.

This statute remained unchanged until the passage of Act 10 on June 28, 2011. The preamble to Act 10 explains that its purpose was to strengthen the right of self-defense. *See* H.B. 40 159th Gen. Assemb., Reg. Sess. (Pa. 2011). In so doing,

however, Act 10 did not substantively alter the law regarding the use of deadly force within a residence. The statute, as amended by Act 10, provides as follows:

> (2) The use of deadly force is not justifiable under this section unless the actor believes that such force is necessary to protect himself against death, serious bodily injury, kidnapping or sexual intercourse compelled by force or threat; nor is it justifiable if:
>
> ***
>
> (ii) the actor knows that he can avoid the necessity of using such force with complete safety by retreating, except the actor is not obliged to retreat from his dwelling or place of work, unless he was the initial aggressor or is assailed in his place of work by another person whose place of work the actor knows it to be.

18 Pa.C.S.A. § 505(b)(2)(ii). Although revised in format, current section 505(b)(2)(ii) and former section 505(b)(2)(ii)(A) both provide that a person may use deadly force if he or she believes that it is necessary to prevent death, serious bodily injury, kidnapping, or sexual intercourse compelled by force or threat, and that there is no duty to retreat from the person's dwelling or place of work unless that person is the initial aggressor or is assailed by a person who also works in the same place. The elements of a castle doctrine defense remained unaltered.

Act 10 further amended section 505(b) to add six subsections. The subsections included the statute at issue in the present case, the relevant portion of which we reiterate:

> Except as otherwise provided in paragraph (2.2), an actor is presumed to have a reasonable belief that deadly force is immediately necessary to protect himself against death, serious bodily injury, kidnapping or sexual intercourse compelled by force or threat if both of the following conditions exist:

(i) The person against whom the force is used is in the process of unlawfully and forcefully entering, or has unlawfully and forcefully entered and is present within, a dwelling, residence or occupied vehicle … .

(ii) The actor knows or has reason to believe that the unlawful and forceful entry or act is occurring or has occurred.

18 Pa.C.S.A. § 505(b)(2.1).  Section 505(b)(2.1) does not alter a person's right to use deadly force within a dwelling.  Rather, by its plain language, section 505(b)(2.1) creates a presumption.

In general terms, "a presumption is a standardized practice, under which certain facts are held to call for uniform treatment with respect to their effect as to proof of other facts."  2 Kenneth S. Broun, et al., MCCORMICK ON EVIDENCE 675-76 (7th ed. 2013). Presumptions are "staples of our adversary system of factfinding."  Commonwealth v. MacPherson, 752 A.2d 384, 389 (Pa. 2000) (quoting County Court of Ulster County v. Allen, 442 U.S. 140, 156 (1979)); *see also* City of Pittsburgh v. W.C.A.B. (Robinson), 67 A.3d 1194, 1204 (Pa. 2013); Commonwealth v. Hall, 830 A.2d 537, 544 (Pa. 2003).  "It is often necessary for the trier of fact to determine the existence of an element of the crime—that is, an 'ultimate' or 'elemental' fact—from the existence of one or more 'evidentiary' or 'basic' facts."  MacPherson, 752 A.2d at 389 (quoting County Court of Ulster County, 442 U.S. at 156).  Presumptions and inferences[8] are the evidentiary mechanisms that allow such determinations to be made.  Hall, 830 A.2d at 544.

---

[8]  The terms "presumption" and "inference" are "commonly and often interchangeably" used to refer to these mechanisms.  MacPherson, 752 A.2d at 389 (citing Barnes v. United States, 412 U.S. 837 (1973)).

The presumption created by section 505(b)(2.1)[9] codifies the inference between certain basic facts (an unlawful and forceful entry and knowledge thereof, as described in subsections 505(b)(2.1)(i) and (ii)), and an element of a castle doctrine defense (a reasonable belief that deadly force is immediately necessary). Both before and after the enactment of section 505(b)(2.1), a finder of fact could make this inference, and section 505(b)(2.1) merely provides the factfinder with an evidentiary mechanism to assist in evaluating the merits of making this inference based upon the specific facts presented in the case. We note that the current standard jury instruction directs the jury to

---

[9] Presumptions are sometimes further classified as permissible, mandatory rebuttable, and mandatory conclusive. A permissive presumption is a "logical tool" that permits, but does not require, the trier of fact to proceed "from one fact to another, if the trier believes that the weight of the evidence and the experiential accuracy of the inference warrant so doing." City of Pittsburgh, 67 A.3d at 1204. A mandatory rebuttable presumption instructs the finder of fact that, upon proof of a basic fact, he or she must find the elemental fact, unless the opposing party comes forward with evidence to rebut the presumed connection between the facts. Id. (citing Hall, 830 A.2d at 545); MacPherson, 752 A.2d at 389-90 (citing Francis v. Franklin, 471 U.S. 307, 314 n.2 (1985)). A conclusive mandatory presumption removes the presumed element from the case once a party has proved the predicate facts giving rise to the presumption. Commonwealth v. Kelly, 724 A.2d 909, 911 (Pa. 1999).

As the issue presently before us does not require a determination as to whether the section 505(b)(2.1) presumption is permissible or mandatory rebuttable, we decline to make this distinction herein. For present purposes, it is sufficient that section 505(b)(2.1) instructs the factfinder that it may make the available inference and that the Commonwealth may overcome it with evidence to the contrary.

Section 505(b)(2.1) does not create a mandatory conclusive presumption. Nothing in the language of the provision suggests that the presumption is not rebuttable, and the parties do not so contend. Moreover, as the Commonwealth points out, such an interpretation would be absurd in these circumstances, as a defendant would be entitled to the benefit of an (unrebuttable) presumption even after testifying that he or she had no concern for his or her safety and instead used deadly force just because "it might be fun to kill him." Commonwealth's Brief at 17 n.3 (citing 1 Pa.C.S.A. § 1922 ("General Assembly does not intend a result that is absurd, impossible of execution or unreasonable.")).

"[c]onsider the realities of the situation faced by the defendant … when you assess whether the Commonwealth has proved beyond a reasonable doubt either that [the defendant] did not believe [he] was actually in danger of death or serious bodily injury … or that, while [the defendant] did believe that, [that] belief was unreasonable." Pa.SSJI (Crim) § 9.501A (2012).

Section 505(b)(2.1) does not, as the Commonwealth contends, broaden the rights of the accused when asserting a castle doctrine defense. Commonwealth's Brief at 14. To the contrary, both before and after the enactment of section 505(b)(2.1), a defendant was justified in using deadly force if he or she was not the initial aggressor and had a reasonable belief that such force was necessary to protect against death, serious bodily injury, kidnapping, or sexual intercourse compelled by force or threat, and a defendant had no duty to retreat when attacked in his or her dwelling. Likewise, both before and after the enactment of section 505(b)(2.1), the Commonwealth could overcome a claim of self-defense under the castle doctrine by establishing that the defendant did not actually possess the requisite fear or that the defendant's belief was not reasonable.[10] In sum, the section 505(b)(2.1) presumption does not alter either the elements of a castle doctrine defense or the historical right to use deadly force in one's home.[11] Instead, it provides an evidentiary mechanism to aid in the factfinder's evaluation of the merits of a castle doctrine defense.

---

[10] Indeed, the Commonwealth does not allege that it would have tried its case differently if the trial court had agreed to give a castle doctrine instruction containing the presumption.

[11] We recognize, as did the Superior Court, that other amendments to section 505(b) not at issue in the present appeal alter the duty to retreat in the context of self-defense; (continued…)

As evidentiary mechanisms, presumptions have no effect unless or until they are implicated in the course of a criminal proceeding. This reality was recognized by the Superior Court in a case that involved a statute that provided a mechanism for the evaluation of evidence, although not a presumption. C.R.F. v. S.E.F., 45 A.3d 441 (Pa. Super. 2012), involved a custody action that commenced in 2008. In July 2010, the mother filed a petition seeking permission to relocate. At that time, relocation requests were governed by the three factors set forth in Gruber v. Gruber, 583 A.2d 434 (Pa. Super. 1990), *superseded by statute,* 23 Pa.C.S.A. § 5337, *as recognized by* E.D. v. M.P., 33 A.3d 73, 79 (Pa. Super. 2011). In January 2011, the new Custody Act became effective. The new Custody Act included a provision that specifically addressed relocation requests. This provision included the Gruber factors, but also expanded

(…continued)
for example, subsection (2.3), commonly referred to as a "stand your ground" law, provides:

> An actor who is not engaged in a criminal activity, who is not in illegal possession of a firearm and who is attacked in any place where the actor would have a duty to retreat under paragraph (2)(ii) has no duty to retreat and has the right to stand his ground and use force, including deadly force, if:
>
> (i) the actor has a right to be in the place where he was attacked;
>
> (ii) the actor believes it is immediately necessary to do so to protect himself against death, serious bodily injury, kidnapping or sexual intercourse by force or threat; and
>
> (iii) the person against whom the force is used displays or otherwise uses:
>
>> (A) a firearm or replica of a firearm as defined in 42 Pa.C.S. § 9712 (relating to sentences for offenses committed with firearms); or
>>
>> (B) any other weapon readily or apparently capable of lethal use.

18 Pa.C.S.A. § 505(b)(2.3). Our decision here is limited to the presumption created for cases falling within the parameters of section 505(b)(2.1).

upon them and broadened the areas of inquiry that a trial court must consider when ruling on a relocation request.[12]   The hearing on the mother's relocation petition occurred in April 2011, after the effective date of the new Custody Act.   In ruling on the relocation request, the trial court reasoned that because mother filed her relocation petition prior to the effective date of the new Custody Act, the new Custody Act's relocation provision did not apply.   The Superior Court reversed, concluding that the critical point in time to determine which relocation standard applied was when the hearing on the petition occurred, not when the relocation petition was filed.   This was so, the Superior Court reasoned, because the relocation statute impacts the trial court's analysis of the evidence.   "Thus, applying the factors delineated in [the new Custody Act] to hearings convened after the effective date is the logical reading of the Act since these factors are implicated for the first time at the hearing scheduled to decide the request for relocation." C.R.F., 45 A.3d at 445.

A similar issue was raised in Bethea v. Phila. AFL-CIO Hosp. Ass'n, 871 A.2d 223 (Pa. Super. 2005), *appeal denied*, 871 A.2d 223 (Pa. 2007), a case involving a medical malpractice action filed prior to the enactment of the MCARE Act, 40 P.S. §§ 1303.101-1303.910, but tried after its enactment. Section 512 of the MCARE Act established certain qualifications for a medical expert in a medical malpractice action. In Bethea, the appellee filed a motion to preclude the testimony of the appellant's medical expert because he did not meet the section 512 qualifications.   The trial court

---

[12] The specific provision in question is 23 Pa.C.S.A. § 5337(h).  We need not set forth the precise terms of this provision; it is sufficient to state that section 5337(h) consists of a list of ten factors that a trial court is required to consider when ruling on a relocation request, and further mandates that the trial court give "weighted consideration to those factors which affect the safety of the child." 23 Pa.C.S.A. § 5337(h).

agreed.  In affirming the trial court's ruling, the Superior Court concluded that section 512 does not affect any substantive right of a party, but only creates a procedural avenue by which a party attempts to enforce his or her rights, and as such, is a procedural statute.  Bethea, 871 A.2d at 226.[13]

The reasoning employed in these decisions is equally applicable in the present case.  Section 505(b)(2.1) does not bear on the right to self-defense.  It creates a presumption that impacts the evidentiary burden of a defendant seeking its protection as well as the factfinder's analysis of the evidence in order to determine whether the defendant has established a castle doctrine defense.  It is a law that provides a method to enforce the right of self-defense as embodied by the castle doctrine.  In short, it is a procedural statute. See Morabito's Auto Sales, 715 A.2d at 386 (holding that laws affecting vested rights are substantive while laws addressing methods of enforcing such rights are procedural).

As a procedural statute, section 505(b)(2.1) applies to litigation pending at the time it is passed as well as litigation commenced after its enactment.  Commonwealth v. Estman, 915 A.2d 1191, 1194 (Pa. 2007).  As both of Childs' trials were held after its effective date, Childs was entitled to an instruction in conformance therewith.  While both parties construct their arguments in terms of the retroactive application of section

---

[13]  C.R.F. and Bethea are in line with decisions of this Court, dating back two centuries, that have concluded that evidentiary statutes are procedural in nature and therefore apply retrospectively.  See McFarland v. Moyamensing,  1825 WL 1904 (Pa. 1825) (holding that statute that altered rule of evidence governing competency of witnesses applied to litigation pending at the time of statute's enactment);  Foster v. Gray, 22 Pa. 9, 16 (1853) (finding Act of March 14, 1846, which permitted certified copies of sheriffs' deeds to be admitted into evidence in lieu of the original deed, did not act to divest any right, and could therefore be applied to litigation pending at the time of enactment).

505(b)(2.1) and the Superior Court addresses retroactivity in its decision, once the conclusion is made that the statute is procedural, the question of retroactive application is not truly at issue in this case. A fundamental principle of statutory construction is that all statutes are to be applied prospectively unless the legislature expressly provides for retroactive application. 1 Pa.C.S.A. § 1926. As section 505(b)(2.1) was effective at the time of Childs' trials, there is no specter of improper retroactive application. The statutory evidentiary presumption was in effect at the time of his trial. Retroactivity concerns would arise only if a defendant raised self-defense based on the castle doctrine at a trial prior to August 29, 2011 (the effective date of section 505(b)(2.1)), and then filed a post-trial motion after August 29, 2011, arguing that he was entitled to section 505(b)(2.1) jury instruction at his trial. That is not the case here.

As noted above, the Commonwealth argues that the evidentiary presumption contained in section 505(b)(2.1) must be read as having a substantive effect because it was "part of a … comprehensive effort to revamp the law of self-defense" and broaden the substantive rights of the accused. Commonwealth's Brief at 14-15.[14] The Commonwealth supports this claim by pointing to Morabito's Auto Sales, in which, according to the Commonwealth, this Court held that "a legislative presumption created by a new statute applie[s] prospectively regardless of whether it could be more properly 'characterized as substantive or procedural.'" Id. at 15 (quoting Morabito's Auto Sales,

---

[14] The Commonwealth states that "even the Superior Court majority acknowledged" that section 505(b)(2.1) was part of legislation that broadened the right to self-defense. Commonwealth's Brief at 14. What the Superior Court said, however, is that "[p]ortions of Act 10 **that are not relevant here** (see supra, note 11) undoubtedly broaden" an accused's substantive rights, and points to § 505(b)(2.3). Childs, 272 EDA 2013 at *26 (emphasis added).

715 A.2d at 387). The Commonwealth's reading of this case is incorrect, as we made no such pronouncement. We did not address legislative presumptions in the context of the substantive/procedural paradigm, as our decision was based on grounds that did not require us to reach that question.

In Morabito's Auto Sales, the eponymous used auto dealership was charged with violating a statute that required the timely filing and delivery of assigned certificates of title to the Department of Transportation ("DOT"). Because the violations involved the dealership's failure to timely submit documents, the exact dates when DOT received the documents in question were directly at issue. The records produced by DOT to establish these dates were illegible. The dealership objected to their admission because the work identification numbers, which indicate the date that DOT received the document, could not be read. The trial court agreed that the documents were illegible, but admitted the documents pursuant to section 1103.1(d.1) of the Vehicle Code. This provision of the Vehicle Code required DOT to stamp a document received from a dealer with a work identification number within one business day of receiving the document, and further provided that "if the displayed stamp is not legible, a certification by the department of the date that the application was received shall be accepted by … [a] court as prima facie evidence of that date." 75 Pa.C.S.A. § 1103.1(d.1). Section 1103.1(d.1) was enacted in December 1994 and became effective in February 1995, but all of the dealership's violations were alleged to have occurred in 1993. Furthermore, DOT provided the certifications as to the dates in September 1994, also prior to the enactment of section 1103.1(d.1). The dealership challenged the trial court's reliance on section 1103.1(d.1) as an improper retroactive application of a statute.

In resolving the issue of whether the trial court erred in admitting the documents, this Court recognized that "the arguments … focused largely on whether to classify [] section 1103.1(d.1) as [] substantive or procedural[,]" but did not find it necessary to resolve this question. Rather, we concluded that the "[t]he courts below have taken out of context the excerpt from subsection (d.1) on which they relied [(the final sentence regarding illegibility and a certification by the DOT as prima facie evidence)] to allow admission of the documents." Morabito's Auto Sales, 715 A.2d at 386. We held that this singular sentence, which allowed for a presumption, could not be read apart from the preceding language of subsection (d.1), which set forth the procedure for establishing the date of receipt of documents received from dealers. In other words, the presumption did not exist apart from the duty, and because the duty was not in effect at the time DOT provided the certifications (that is, DOT did not have an obligation to stamp the documents within one business day of receipt), there was no basis to apply the presumption that the documents were received within one business day of receipt. Id. at 387.

The situation in Morabito's Auto Sales is in obvious contrast to the present case. There has been no attempt to rely on or give effect to only a portion of section 505(b)(2.1), nor does the presumption codified in section 505(b)(2.1) apply only if certain other criteria are not met. Quite simply, our rationale in Morabito's Auto Sales cannot be extrapolated to apply to the case presently before us.[15]

---

[15] It is notable that while the Commonwealth referred to Morabito's Auto Sales as being "on point," it does not provide any analysis as to how it could arguably be applied to the present case. Commonwealth's Brief at 15. The Commonwealth also argues that the jury instruction requested by Childs would have operated in a substantive manner (continued…)

Having determined that section 505(b)(2.1) is a procedural statute, the Commonwealth's remaining arguments are rendered moot. As a procedural statute, section 505(b)(2.1) applied to litigation pending at the time of its enactment as well as litigation commenced following its enactment. Estman, 915 A.2d at 1194. Both of Childs' prosecutions commenced after the enactment of section 505(b)(2.1), and so Childs was entitled to a jury instruction in conformance with section 505(b)(2.1). Accordingly, we affirm the order of the Superior Court, which vacated Childs' judgment of sentence and remanded the matter for a new trial.

Order affirmed.

Chief Justice Saylor and Justices Baer, Todd, Dougherty and Wecht join the opinion.

Chief Justice Saylor files a concurring opinion.

Justice Todd files a concurring opinion.

Justice Dougherty files a concurring opinion.

---

(…continued)
because it failed to indicate that the presumption is not conclusive. Id. at 16-17. The record reveals that the Commonwealth did not object on this basis at either of Childs' trials, and so this claim has not been preserved for appeal. Pa.R.A.P. 302(b).